**CUTHBERTSON THOMAS, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2011-0073
Supreme Court of the Virgin Islands
December 2, 2013

Andrew L. Capdeville, Esq., Law Offices of Andrew L. Capdeville, P.C., St. Thomas, USVI, *Attorney for Appellant*.

PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(December 2, 2013)

CABRET, *Associate Justice.* Following a jury trial, Cuthbertson Thomas and his co-defendant Richie Fontaine were convicted of nine felony counts each, arising from a shooting outside of an elementary school on St. Thomas. Thomas challenges his convictions on four grounds, arguing that the Superior Court erred: (1) by denying his motion for acquittal because the prosecution did not present sufficient evidence to convict; (2) by denying his motion for a mistrial based upon the testimony of Detective Jose Allen; (3) by permitting the jury to visit the crime scene after the close of the People's case-in-chief; and (4) by admitting an unduly prejudicial photograph into evidence showing a small wound on one of the victims. For the reasons that follow, we affirm Thomas's convictions, but remand for resentencing in conformity with 14 V.I.C. § 104.

## I. FACTUAL AND PROCEDURAL HISTORY

On May 6, 2009, shots were fired in the vicinity of the Emmanuel Benjamin Oliver Elementary School on St. Thomas. At the scene of the shooting, a purple Toyota Corolla was struck by multiple bullets. Although the passengers were not injured, one bullet entered a school bus and injured M.H., a ten-year-old child. On September 23, 2009, the People filed an Information, which was later amended, charging Thomas and Fontaine with nine crimes each arising from the shooting.[1]

---

[1] The amended information charged both Thomas and Fontaine with one count of attempted first-degree murder pursuant to V.I. CODE ANN. tit. 14 §§ 11(a), 331, 921, 922(a); two counts of third-degree assault pursuant to 14 V.I.C. §§ 11(a), 297(2); three counts of unauthorized use of a firearm during the commission of a crime of violence pursuant to 14 V.I.C. §§ 11(a), 2253(a); one count of child abuse pursuant to 14 V.I.C. §§ 11(a), 505; one count of aggravated child abuse pursuant to 14 V.I.C. §§ 11(a), 505, 506; and one count of reckless endangerment pursuant to 14 V.I.C. §§ 11(a), 625(a).

On December 1 and 3, 2010, Thomas and Fontaine were tried before a jury. The People first called Shunell Fregiste, the driver of the purple Corolla. Fregiste testified that on the day of the shooting he drove, unlicensed, to the Emmanuel Benjamin Oliver Elementary School to pick up a friend's child. Larry Fontaine and two minors were passengers in the car with him.[2] While outside the school, Fregiste spotted three individuals walking down a nearby one-way street. He recognized two of the three individuals as Thomas and Fontaine, and testified that Thomas had a "skinny" and "tall" build and was wearing a white shirt with a New York Yankees baseball cap while Fontaine had a "short" and "tough" build and was wearing a white shirt. (J.A. 152-53, 176-77.) Both men had masks or scarves covering their faces. Despite the mask, however, Fregiste testified he was able to recognize Thomas because they had grown up together in Dominica where they went to high school and participated in the Boy Scouts together. Fregiste also testified that in his experience, Thomas always wore a New York Yankees baseball cap.

Moments after seeing both men, Fregiste saw them reach inside their clothing and draw out firearms. Fregiste sped up, but came across a green truck and school bus in his path. Fregiste then heard gunshots from behind his car, and when he turned back in his seat to look, he saw Thomas, Fontaine, and the third individual he did not know firing toward his vehicle. Fregiste swerved his vehicle around the school bus and drove off, though his car was struck by bullets before getting away.

After returning home, Fregiste asked a friend to tell the police that she had been driving the purple Corolla. Fregiste did not tell her, however, or the other passengers in the car that he recognized two of the shooters. A few days after the shooting, on May 15, 2009, Fregiste spoke to the police for the first time, but denied driving the purple Corolla, seeing any weapons, or being able to identify anyone involved in the shooting. Two weeks after the shooting, on May 20, 2009, Fregiste spoke with the police a second time and gave a written statement in which he admitted that he drove the car and also identified Thomas and Fontaine as the shooters. During his second meeting with the police, Fregiste said that he had not actually seen Thomas and Fontaine with the guns, instead he said that he saw them immediately before the shooting with masks over their faces

---

[2] Larry Fontaine is unrelated to Thomas's co-defendant Richie Fontaine.

coming towards the vehicle. At that time, Fregiste also picked Thomas out of a photo array as one of the shooters. Defense counsel brought out each of these inconsistencies in Fregiste's statements to the police during cross-examination. Fregiste also admitted on cross-examination that he instructed his friend to lie to the police because he was afraid he would be prevented from getting a license in the future if his unlicensed driving was discovered.

Next, the People called Larry Fontaine, who was a passenger in the car with Fregiste on the day of the shooting. Larry Fontaine testified that he and Fregiste drove to the elementary school, that he saw three men wearing white shirts approach the car with "their hands sticking out," (J.A. 227) and that he heard a lot of gunfire. He described one of the men as tall and thin and the other as short and chubby. He also testified that he did not see scarves or anything covering the faces of the three men he saw on the day of the shooting. Despite that fact, he was unable to identify any of the shooters because he only "[g]lance[d] them, like seconds" before reacting to the shooting by moving to cover the children in the back of the car. (J.A. 217.)

A third eyewitness, Michelle Baron, told the jury that she was sitting in her car parked down the street from the school listening to gospel music on May 6, 2009, when the shooting occurred. Baron testified that she heard ten to fourteen gunshots and saw a purple car and a white car speed past her car. However, Baron did not see the shooters. After the shooting, she left her car and walked up to the scene where she found M.H. wounded in the school bus.

The People also called Detective Jose Allen who testified that he was personally familiar with both Thomas and Fontaine. Detective Allen told the jury that he had seen Thomas and Fontaine together and was aware that they knew each other. He also testified that he had seen Thomas wear a black New York Yankees baseball cap on prior occasions. Just before cross-examination, the People requested a sidebar conference to inform the court and the defendants' attorneys that Allen knew Thomas and Fontaine because of their involvement in prior criminal investigations. The People alerted the defendants' attorneys to that information in the event that they chose to limit their cross-examination to avoid the jury hearing anything prejudicial concerning those investigations. In response, Thomas and Fontaine moved to strike Allen's testimony and Thomas also moved for a mistrial, claiming that his ability to cross-examine Allen was

unduly hampered. The judge denied the motions to strike and Thomas's motion for mistrial, finding that the jury had not heard any prejudicial testimony and that the attorneys still had the opportunity to cross-examine Allen.

The People also called M.H., who testified that following school on May 6, 2009, he was in the school bus waiting to be driven to an afterschool program when he heard "seven or so gunshots," (J.A. 449, 453), felt something hit him, and then fell to the floor. M.H. did not testify to seeing the shooters. Through other witnesses, the People admitted into evidence M.H.'s shirt and jacket showing a bullet hole, as well as his medical records and a photograph of the gunshot wound. The emergency responders who transported M.H. to the Roy L. Schneider Hospital on St. Thomas, as well as the physician who treated him at the hospital, also testified about M.H.'s injuries. M.H.'s physician explained that M.H. had to be airlifted to Puerto Rico for further treatment because of the seriousness of his injuries.

In his defense, Thomas presented the testimony of a single witness, Sativa Petersen, his former girlfriend and the mother of his child. Petersen testified that Thomas was with her at her apartment in Estate Tutu on May 6, 2009 at the time the shooting occurred.

After all the witnesses testified, the trial judge permitted the jury to visit the scene at the Emmanuel Benjamin Oliver Elementary School. Although the jury visit occurred after the final witness testified for the People and the People rested, the People requested it on the first day of trial; but the trial judge scheduled the visit to take place on the last day of trial. Before the People rested on the morning of the last day of trial, the court gave the parties the proposed jury instruction it intended to deliver to the jury before the scene viewing. The court asked the parties whether they had any objections concerning the instruction, to which defense counsel responded "[n]o, Your Honor, not from Mr. Thomas." (J.A. 463-64.) The court then gave the People the choice of calling its final witness either before or after the viewing. The People decided it would call its final witness first. Thomas then interjected, indicating that he would like to call Petersen before the site view, as she had been waiting to testify since the previous day and her testimony would not take long. Agreeing with Thomas, the court stated, "[s]ure, that makes sense. . . . Marshal, alert [the] People that we are going to call a couple of witnesses so it will be a while before we go." (J.A. 467.) The People then called its

final witness and rested, Thomas called Petersen, and the jurors were then taken to the crime scene. At the school, the jurors were permitted to view the scene, but no witnesses testified and no other evidence was presented to the jury. After returning from the site view, the parties gave their closing arguments, the court instructed the jury, and the jury began deliberations.

The jury later returned a unanimous guilty verdict against both defendants on all counts. On December 17, 2010, Thomas filed two written motions, one for a judgment of acquittal and the other for a new trial. In a July 29, 2011 Memorandum Opinion and Order, the Superior Court denied both motions. On October 3, 2011, the Superior Court entered judgment, sentencing Thomas to twenty years for attempted murder, fifteen years for unauthorized possession of a firearm during the commission of an attempted murder, five years for third-degree assault, fifteen years for unauthorized possession of a firearm during the commission of a third-degree assault, twenty years for aggravated child abuse, and five years for reckless endangerment. The court ordered all of the sentences to run concurrently with the sentence for attempted murder. The court also deemed the second conviction for third-degree assault merged with the conviction for attempted murder, the third conviction for unauthorized possession of a firearm merged with the first conviction for that same offense, and the child abuse conviction merged with the aggravated child abuse conviction. Lastly, the court imposed two $25,000 fines pursuant to the firearm statute and $75 in court costs. Thomas filed a timely notice of appeal on September 8, 2011.[3]

## II. JURISDICTION

We have jurisdiction over this criminal appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." A judgment in a criminal case is a final order

---

[3] Supreme Court Rule 5(b)(1) provides that "[a] notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment." Therefore, even though Thomas filed his notice of appeal before the Superior Court's Judgment and Commitment was entered into the docket, it is timely.

from which an appeal may lie. *Phillip v. People*, 58 V.I. 569, 582 (V.I. 2013).

## III. DISCUSSION

Thomas argues that the Superior Court erred by (1) denying his motion for judgment of acquittal because the prosecution did not present sufficient evidence to convict since the only proof that Thomas was present at the scene or had the requisite intent to commit the crime came from a witness who Thomas argues was unbelievable; (2) denying his motion for mistrial based on the testimony of Detective Jose Allen; (3) permitting the crime scene visit after the close of the People's case; and (4) admitting into evidence a photograph, which showed a small wound on M.H.[4] We consider each argument in turn.

### A. The People Presented Sufficient Evidence to Convict.

Thomas first argues that the Superior Court erred by denying his motion for judgment of acquittal because the testimony of Fregiste, the only witness that could place Thomas at the scene of the crime, was "incredible as a matter of law." (Appellant's Br. 11.) Thomas's entire sufficiency challenge rests on whether the jury could rationally accept Fregiste's version of the events. The Superior Court ruled that credibility determinations are the sole province of the jury, and that the jury was free to accept Fregiste's testimony and convict based upon it.

"[I]n reviewing the Superior Court's denial of [Thomas's] motion for judgment of acquittal based on the sufficiency of the evidence, we exercise plenary review and apply the same standard as the trial court." *Francis v. People*, 56 V.I. 370, 379 (V.I. 2012) (citing *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009)). In assessing whether the People presented sufficient evidence to convict, "this Court is required to view the evidence in the light most favorable to the People and apply a highly deferential standard of review to the jury's verdict." *Augustine v. People*, 55 V.I. 678, 684 (V.I. 2011) (citing *Stevens*, 52 V.I. at 304). Indeed, we are typically

---

[4] During the site view, both Thomas and Fontaine objected to the presence of Superior Court Marshals displaying firearms before the jury (J.A. 522-24), but — unlike Fontaine — Thomas does not raise this issue in his brief and therefore it is waived pursuant to Supreme Court Rule 22(m). *See Fontaine v. People*, 59 V.I. 640, 656-57 (V.I. 2013) (rejecting Fontaine's argument that the presence of the armed marshals was a due process violation).

"prohibited from weighing the evidence or determining the credibility of witnesses." *Williams v. People (Williams I)*, 56 V.I. 821, 835 (V.I. 2012) (citing *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009)).

 Thomas concedes that our typical standard of review for sufficiency challenges is to defer to the jury on credibility determinations. Thomas is also correct that some courts have recognized an appellate court's responsibility to review credibility determinations in sufficiency challenges where the witness's testimony was "incredible as a matter of law." *See, e.g., United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) ("Credibility determinations are left to the jury and the jury's verdict will not be disturbed on appeal unless the testimony is incredible as a matter of law." (internal quotation marks and citation omitted)). Such appellate review of credibility determinations is "ultra-narrow," *United States v. Kizeart*, 505 F.3d 672, 675 (7th Cir. 2007), and before an appellate court can overturn a jury's credibility determination, the appellant must satisfy

> an exacting standard[] [which] can be met, for instance, by showing that it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all. In contrast, witnesses' disagreements about such facts as the color or direction of the car are routine conflicts in testimony, inconsistencies well within the province of the jury to sort out.

*United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001) (internal quotation marks and citations omitted); *see also United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991) ("[T]he jury is the ultimate arbiter of the credibility of a witness; testimony generally should not be declared incredible as a matter of law unless it asserts facts that the witness physically could not have observed or events that could not have occurred under the laws of nature."); *Phillip*, 58 V.I. at 584 ("[A]n appellate court may disregard the jury's reliance on a witness's testimony when that testimony is inherently incredible or improbable." (internal quotation marks omitted)).

 Here, the evidence presented was the kind "well within the province of the jury to sort out." *Hayes*, 236 F.3d at 896. At trial, Fregiste admitted that he lied or omitted details in each of his pretrial encounters with police and also admitted that he asked his friend to falsify a police

report to say she was driving the purple Corolla at the time of the shooting. Detective Sofia Rachid, the lead investigator, corroborated Fregiste's testimony that he initially lied to the police about who drove the car. Fregiste's testimony conflicted somewhat with the testimony of Larry Fontaine — another eyewitness — regarding whether the shooters, including Thomas, were wearing masks. But despite these inconsistencies, Fregiste's testimony largely corroborated Larry Fontaine's testimony. Larry Fontaine testified that he was with Fregiste on May 6, 2009, and saw the same number of men (three), coming from the same street, wearing the same color shirts (white), with the same builds (one tall and skinny, one short and chubby), and that shots were fired at the car. Baron, another witness, also testified that on May 6, 2009, she saw a purple car matching the description of the one Fregiste was driving speed away from the area. Finally, and most critically, there is no evidence in the record indicating that Fregiste would not have been able to see the three assailants from where he was in the car or that his version of the shooting was impossible under the laws of nature. Accordingly, we hold that Fregiste's testimony was not incredible as a matter of law and therefore we are bound to accept the jury's determination that his testimony was credible.

█ Thomas also submits that the evidence was insufficient because the People failed to prove the shooter's identity since it presented "the eyewitness testimony of [only] a single witness," Fregiste, whose "dubious and unbelievable testimony [is the only] evidence link[ing] Appellant to the shooting." (Appellant's Br. 7, 12.) But as indicated above, it was for the jury to determine whether Fregiste's testimony was "dubious and unbelievable," and the testimony of a single witness can be sufficient to prove a perpetrator's identity beyond a reasonable doubt. *Connor v. People*, 59 V.I. 286, 290-91 (V.I. 2013) (" '[i]f trustworthy, a single positive eyewitness identification may be sufficient proof of guilt, even if it is contradicted by the accused or by alibi testimony' " (quoting 29A AM. JUR. 2D *Evidence* § 1402)); *see also United States v. Levi*, 405 F.2d 380, 383 (4th Cir. 1968) (applying the common law "one witness rule"). Therefore, because Thomas's sufficiency argument rests solely on challenging Fregiste's credibility, we reject Thomas's challenge and hold that there was sufficient evidence to convict.

## B. The Superior Court Did Not Commit Reversible Error in Denying Thomas's Motion for a Mistrial Based Upon the Testimony of Detective Jose Allen.

Thomas next argues that the Superior Court committed reversible error by denying his motion for a mistrial based upon Detective Allen's testimony, claiming Allen was not "present" to be cross-examined because the "alleged basis of [Allen's] knowledge [of Thomas] was so . . . ingrained in . . . highly-prejudicial other crime evidence as to be unextractible." (Appellant's Br. 19.) In addition, Thomas argues that Allen's testimony was "scarcely probative, highly prejudicial," and violated the Confrontation Clause. (Appellant's Br. 15.) The People counter that the court did not abuse its discretion in denying Thomas's motion for a mistrial because Detective Allen's testimony "was not prejudicial and [Thomas] had an opportunity for cross examination." (Appellee's Br. 12.) The Superior Court held that the admission of Allen's testimony did not violate the Confrontation Clause because (1) the court "was careful to limit Allen's testimony to avoid the introduction of prejudicial information regarding [Thomas]'s prior crime," (2) Thomas was not prevented from investigating the witness's background and character, and (3) the "jury was charged with weighing the credibility of witness Allen[; therefore,] any error in admitting Allen's testimony [wa]s harmless in light of other evidence presented at trial." (J.A. 37-38.) "The standard of review for challenges under the Sixth Amendment's Confrontation Clause is plenary." *Latalladi v. People*, 51 V.I. 137, 141 (V.I. 2009) (citing *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998)).

The Sixth Amendment's Confrontation Clause provides in pertinent part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 50, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly *its* use of *ex parte* examinations as evidence against the accused." This Court has held that "the Confrontation Clause is implicated [if] a declarant's statement is introduced against the defendant at trial and the declarant does not appear at trial." *Rivera v. People*, 53 V.I. 589, 593 (V.I. 2010) (citing *Crawford*, 541 U.S. at 59). But the facts of this case are unlike the circumstances in

*Crawford* or *Rivera* where a witness's statements against the defendant were introduced without the witness appearing at trial. Here, Detective Allen appeared at trial and the contentious statements were those Allen made at trial. Therefore, no Sixth Amendment Confrontation Clause deprivation of the types considered in *Crawford* and *Rivera* occurred here.

██ Nevertheless, Thomas contends that his Sixth Amendment right to confrontation was unconstitutionally impaired because highly incriminating evidence would have inevitably been elicited had he cross-examined Allen about the alleged basis of Allen's knowledge. Thomas describes Allen's personal knowledge as "unextractible," in effect making Allen "not present" for purposes of the Confrontation Clause. (Appellant's Br. 19.) Although this Court is disturbed by the People's actions — putting on testimony that it knew could only be impeached by opening the door to inadmissible testimony and doing so without first apprising the Superior Court or the defendant — we nevertheless do not reach the issue of whether the People violated Thomas's Sixth Amendment right because we find beyond a reasonable doubt that any such violation would have been harmless. *See Browne v. People*, 56 V.I. 207, 229 (V.I. 2012) (requiring that a violation of the Confrontation Clause must be harmless beyond a reasonable doubt to avoid reversal). As stated above, Allen's testimony served the very narrow purpose of corroborating a specific part of Fregiste's testimony, namely, that Thomas associated with his co-defendant and had a specific trait of dress habit, wearing a Yankees hat. However, it was Fregiste — the eyewitness — who testified at much greater length about the basis of his identification of Thomas and Fontaine on the day of the shooting and his description of both, including that Thomas wore a Yankees hat while perpetrating the crime. Fregiste also explained that he grew up with both men, knew them for decades, knew them to be close friends both in Dominica and in the Virgin Islands, and knew Thomas frequently wore a Yankees cap. Accordingly, Detective Allen's testimony was merely cumulative. *See Browne*, 56 V.I. at 237 (noting that in conducting harmless error review, the Court may consider whether the improperly admitted evidence was cumulative). Consequently, even if the Superior Court erred in failing to grant Thomas a mistrial or by refusing to strike Allen's testimony, we are confident beyond a reasonable doubt that any error was harmless.

Lastly, Thomas argues that under Federal Rule of Evidence 401[5] Allen's testimony was not relevant, describing its probative value as "only a scintilla more than nil." (Appellant's Br. 17.) At trial, Thomas only objected to Detective Allen's testimony based on the Confrontation Clause, not the rules of evidence. Therefore, we review this portion of his argument for plain error only. *See Fontaine v. People*, 56 V.I. 571, 580 n.5 (V.I. 2012).

The test for relevance is whether proffered evidence has "*any tendency*" to make the existence of any fact that is "of consequence" to the determination of the action "more probable or less probable than it would be without the evidence." FED. R. EVID. 401 (defining relevant evidence) (emphasis added). The "any tendency" language makes the standard for Rule 401 relevance very easy to satisfy. *United States v. Starnes*, 583 F.3d 196, 214, 52 V.I. 1051 (3d Cir. 2009) ("Rule 401 does not raise a high standard" and evidence "is irrelevant only when it has no tendency to prove a consequential fact" (internal quotation marks omitted)). Here, Allen testified from personal knowledge that Thomas and Fontaine associated with one another and that Thomas frequently wore a Yankees hat. This testimony corroborated Fregiste's testimony with respect to Thomas's tendency to wear a Yankees hat and association with Fontaine, and bolstered Fregiste's credibility. Allen's testimony, even if introduced only for this narrow purpose, still had *some tendency* to make the existence of certain facts which Fregiste testified to "more probable . . . than it would be without" Allen's testimony. FED. R. EVID. 401; *see also United States v. Green*, 617 F.3d 233, 251 (3d Cir. 2010) ("evidence concerning a witness's credibility is always relevant" including "evidence corroborating that witness's testimony" (internal quotation marks omitted)). And even if that tendency was minimal, it is enough to satisfy the requirements for relevance under Rule 401. *See, e.g., United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007) ("the degree of materiality and probativity necessary for evidence to be relevant is minimal" (internal quotation marks omitted)); *United States v. Caver*, 470 F.3d 220, 241 (6th Cir. 2006) (holding that evidence was relevant even where that relevance was "attenuated").

---

[5] The Federal Rules of Evidence apply in the Superior Court pursuant to Act No. 7161 (V.I. Reg. Sess. 2010), which became law on April 7, 2010. *Fontaine v. People*, 56 V.I. 571, 587 n.10 (V.I. 2012).

██ ██ Thomas also submits that Allen's testimony was "so highly prejudicial and so utterly lacking in evidentiary foundation as to call the entire verdict into question." (Appellant's Br. 16.) He asserts that Allen's testimony about Thomas's tendency to wear a Yankees hat is relevant only if, under Federal Rule of Evidence 104(b),[6] the People presented "evidence [of the conditional fact] that the hats belonging to [Thomas] and to the masked gunman [were] in fact the same."[7] (Appellant's Br. 17.) But this argument goes entirely to the weight of the evidence, not its admissibility. While evidence that the hat Allen saw Thomas wearing and the hat Fregiste saw the shooter wear were one and the same would have undoubtedly added significant weight to Allen's testimony, that does not make such evidence a condition of admissibility under Rule 104(b). Instead, the only condition on the relevance of Allen's testimony was his personal knowledge of Thomas's tendency to wear a Yankees hat. *Joy Mfg. Co. v. Sola Basic Industries, Inc.*, 697 F.2d 104, 111 n.23 (3d Cir. 1982) ("[t]he personal knowledge rule is . . . a specialized application of . . . Rule 104(b) on conditional relevancy" (internal quotation marks omitted)). Allen testified that he personally observed Thomas wearing a Yankees hat in the past, and this testimony was sufficient to allow the jury

---

[6] Federal Rule of Evidence 104(b) provides in full:

When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.

[7] Thomas also characterizes Allen's testimony as "that highly-speculative realm of probabilistic evidence" denounced by the California Supreme Court in *People v. Collins*, 68 Cal. 2d 319, 66 Cal. Rptr. 497, 438 P.2d 33 (1968). (Appellant's Br. 17.) In *Collins*, the identity of two perpetrators of a robbery was contested. *Id.* at 36-37. An eyewitness identified them as a bearded black male and a white female with blond hair and a pony-tail driving a yellow convertible car. *Id.* An expert mathematician testified, based on groundless assumptions about the proportion of black males, pony tails, yellow convertibles and other variables, that there was a one in twelve million chance that any couple shared the physical characteristics of the defendants. *Id.* From this testimony, the prosecutor asked the jury to make the inference that there was only one chance in twelve million that the defendants were innocent. *Id.* The California Supreme Court denounced the use of probability theory as incapable of proving guilt beyond a reasonable doubt. *Id.* at 39-40 (stating, among other things, that probability theory failed to prove that only *one* couple — the defendants — possessing those physical traits existed in the entire Los Angeles area). Allen's testimony is markedly different in substance from the rejected testimony in *Collins*, where no witness had personal knowledge of the *Collins* defendants, and where the prosecutor relied entirely on a mathematical probability theory alone to make his case. As nothing remotely like this happened at Thomas's trial, *Collins* is entirely inapplicable.

197

to "reasonably find [this] conditional fact" by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 690, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988); *see* FED. R. EVID. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."). Therefore, the Superior Court did not err in admitting this testimony because it was relevant under Rule 401 and the conditional relevancy requirements of Rule 104(b) were satisfied.

## C. The Superior Court Did Not Abuse its Discretion in Permitting the Jury to View the Crime Scene.

 Thomas argues that the Superior Court erred by permitting the jury to view the site of the shooting because the People had already rested its case and did not move to reopen. Thomas never raised this argument to the Superior Court, so once again we review for plain error. And it is abundantly clear that the Superior Court did not commit plain error. The People moved for a site view early in the case to assist the jury. The court granted that motion and the parties arrived on December 3, 2010, with plans in place to visit the scene. It is clear from the record that the court intended to go immediately on the morning of the third to the site visit, but permitted the People — pursuant to the court's authority to direct the mode and order of presentation of evidence[8] — to call its last witness when the People indicated that it would be brief. And the court agreed with Thomas that he too should call his only witness, Petersen, prior to the

---

[8] In *Fontaine v. People*, 56 V.I. 571, 593 (V.I. 2012), we stated that 5 V.I.C. §§ 731 and 732 "vest the trial judge with some discretion over the order that evidence is presented and how witnesses may be questioned by the parties . . . ." We also noted that although the Legislature explicitly repealed the provisions of the Uniform Rules of Evidence ("URE") contained in title 5, chapter 67 — replacing them with the Federal Rules of Evidence — it did not explicitly repeal chapter 65, which contains sections 731 and 732. *Fontaine*, 56 V.I. at 593 n.17 (citing 2010 V.I. Sess. Laws 50 (Act No. 7161 § 15(b))). But we recently held in *Simmonds v. People*, 59 V.I. 480, 499-500 (V.I. 2013), that 14 V.I.C. § 19 — another URE provision not explicitly repealed by Act No. 7161 — was *implicitly* repealed because a "clear and irreconcilable conflict exist[ed]" between section 19 and Federal Rule of Evidence 801. Despite this — even though Thomas was tried after Act No. 7161 became effective on April 7, 2010 — we do not need to decide here whether sections 731 and 732 were also implicitly repealed because the language of these sections is virtually identical to Federal Rule of Evidence 611. *Compare* 5 V.I.C. § 731 ("The order of proof shall be regulated by the sound discretion of the court."), *and* 5 V.I.C. § 732 ("[t]he court may exercise a reasonable control over the mode of inter-rogation"), *with* FED. R. EVID. 611(a) ("court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence").

viewing. Although Thomas argues that "significant trial issues" were raised by the view of the scene, he did not petition the court to re-open his case, or to recall any witnesses for the purpose of recross examination. Consequently, Thomas was no more prejudiced by a site visit after the close of the People's case than he would have been had it occurred earlier. Ultimately, because Thomas's substantial rights were not affected, the Superior Court did not commit plain error in exercising its inherent authority to direct the order of the trial when it permitted the jury visit.

### D. The Superior Court Did Not Abuse its Discretion in Admitting the Photograph of M.H.

Thomas's final argument is that the court erred when it admitted the photograph of M.H. into evidence because the photograph was unduly prejudicial under Federal Rule of Evidence 403. Rule 403 permits the trial court to exclude otherwise admissible evidence if its probative value is "substantially outweighed" by the danger of "unfair prejudice." FED. R. EVID. 403. At trial, the judge found that the picture was not "particularly gruesome or graphic," but that it was "probative with regard to the location of the wound, the fact that the wound did in fact occur, and the identification of the young man as the person who suffered that injury." (J.A. 104.) Accordingly, the Superior Court found that the photograph's probative value was not substantially outweighed by its prejudicial impact.

 We review the Superior Court's evidentiary rulings for abuse of discretion, unless the decision involves the application of a legal precept, in which case we exercise plenary review. *Billu v. People*, 57 V.I. 455, 461 (V.I. 2012) (citing *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008)). We grant the Superior Court wide latitude, however, in exercising its discretion to determine whether evidence is inadmissible as unduly prejudicial. *See Fontaine v. People*, 56 V.I. 660, 671 (V.I. 2012); *People v. Todmann*, 53 V.I. 431, 442 (V.I. 2010) (" '[I]f judicial restraint is ever desirable, it is when [an unfair prejudice] analysis of a trial court is reviewed by an appellate tribunal.' Thus, we may not reverse the trial court's determination under Rule 403 . . . unless we find that the court acted arbitrarily or irrationally." (quoting *Gov't of the V.I. v. Albert*, 241 F.3d 344, 347 (3d Cir. 2001))). " 'Unfair prejudice is measured by the degree to which a jury responds negatively to some aspect of the evidence unrelated to its tendency to make a fact in issue more or less probable.' "

*Fontaine*, 56 V.I. at 671-72 (quoting *Krepps v. Gov't of the V.I.*, 47 V.I. 662, 674 (D.V.I. App. Div. 2006)).

 We note that, as the Superior Court stated, the photograph in contention is not particularly gruesome or prejudicial. The photograph shows M.H. from approximately his elbow to his head, lying on his stomach, with his head facing the camera. The wound appears as a small red mark with a thin trickle of blood running across his back to a small bit of gauze. M.H. does not appear to be in any particular distress or pain in the photograph. Indeed, without the testimony of witnesses, it would not be at all clear that the wound in the photograph came from a bullet and not an abrasion or scrape. The Superior Court also found that the photograph had probative value in showing the existence and location of the wound as well as the identity of the person wounded.[9] In admitting this graphically tolerable photograph for its probative value, the Superior Court decided that the photograph's probative value was not substantially outweighed by any danger of unfair prejudice. The court's decision was neither irrational nor arbitrary, and therefore, was not an abuse of discretion.

### E. Thomas's Sentences Require Remand.

Although Thomas does not raise the legality of his sentence on appeal, in light of this Court's recent decisions, we address *sua sponte* whether his sentences violate 14 V.I.C. § 104. *See Williams I*, 56 V.I. at 830-31; *Brown v. People*, 55 V.I. 496, 506-07 (V.I. 2011) (raising and addressing an illegal sentence *sua sponte*). Because Thomas failed to raise the issue of multiplicity of convictions and sentences before the Superior Court, we review for plain error. *Williams I*, 56 V.I. at 830 (quoting *United States v. Zalapa*, 509 F.3d 1060, 1064 (9th Cir. 2007)).

 Section 104 of title 14 of the Virgin Islands Code states:

> An act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one.

---

[9] The People presented M.H.'s medical records and bloody clothing, the testimony of M.H.'s doctor and emergency responders, and the testimony of M.H. himself to establish the cause of injury and identity of the victim. Thus, much of the photograph's probative value as articulated by the Superior Court was cumulative at best when viewed in conjunction with the other evidence the jury had to consider.

As we explained in *Williams I*, title 14, section 104 of the Virgin Islands Code provides that notwithstanding the fact that an individual can be charged and convicted of violating multiple provisions of the Virgin Islands Code, that individual may only be punished for one of the offenses arising out of a single act. 56 V.I. at 833-34. We recently clarified this holding in *Phillip*, acknowledging that a " 'defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person,' " and therefore under the "multiple victim" exception to section 104's prohibition against multiple punishments for the same act or omission, a defendant may nonetheless receive multiple punishments when a single act of violence harms or risks harming more than one person. *Phillip*, 58 V.I. at 593 (quoting *Neal v. State*, 55 Cal. 2d 11, 9 Cal. Rptr. 607, 357 P.2d 839, 844 (1960)). The multiple-victim exception applies here because Thomas's act of violence — opening fire on a vehicle in the vicinity of an elementary school — was a singular course of conduct that resulted in harm to Fregiste, to M.H., and also risked harming the public in general. *See id.* at 593 ("For the multiple-victim exception to apply, there must be an act of violence that harms or risks harming more than one person." (citing *Neal*, 357 P.2d at 844)).

Here, Thomas was charged with and convicted of the following offenses: three counts of using an unlicensed firearm during the commission of a crime of violence; two counts of assault in the third degree; and one count each of attempted murder in the first degree, child abuse, aggravated child abuse, and reckless endangerment in the first degree. On the facts of this case, the Superior Court correctly determined that Thomas's conviction for attempted murder and one of his convictions for third-degree assault arose out of the same conduct, namely unlawfully firing a gun at Fregiste, and thus because both offenses involved the same victim and arose out the same course of conduct, Thomas could only be punished for one offense. In addition to placing Fregiste in fear of death, however, Thomas also risked injuring members of the public by opening fire outside a crowded elementary school. Thus, the Superior Court correctly determined that reckless endangerment was a separate offense for which Thomas may also be punished. *See Phillip*, 58 V.I. at 594 ("the multiple-victim exception permits us to affirm Phillip's sentences for first-degree murder and first-degree reckless endangerment" because "he committed a single act of violence that harmed or risked harming more

than one person"). The Superior Court also correctly applied section 104's multiple-victim exception to Thomas's firearms convictions by imposing punishment on two of those counts — each count relating to a separate victim — and staying imposition on the third count.

 But section 104 nonetheless precludes imposing multiple punishments for multiple offenses that arise out of the same conduct and harm the same victim. Here, Thomas was convicted of assault in the third degree on M.H. as well as child abuse and aggravated child abuse in relation to M.H. Those offenses — while separate from the offenses involving Fregiste or the public in general — nonetheless arise out of the same course of conduct harming the same victim, namely a stray bullet that inflicted serious injury on M.H. As all three offenses arose from the same conduct towards the same victim, the Superior Court correctly followed section 104 when it concluded that Thomas could not be punished for both child abuse and aggravated child abuse. However, the court failed to follow section 104 when it did not stay punishment for the third-degree assault perpetrated against M.H. in addition to aggravated child abuse.

 As we found in *Williams I*, the Superior Court's failure to heed section 104, even where the court provided for the sentences to run concurrently, is a plain error that requires reversal. 56 V.I. at 832-33. Accordingly, we remand for the Superior Court to enter conviction and announce a sentence for each offense Thomas was convicted of, but then stay imposition of punishment where section 104 is implicated. *See Williams v. People* (*Williams II*), 58 V.I. 341, 354 n.10 (V.I. 2013) (clarifying our holding in Williams's second appeal to this Court and explaining that "notwithstanding our imprecise language" section 104 requires that the Superior Court "announce a sentence for [each] offense[] and to subsequently stay execution of the sentences in which section 104 is implicated").

## IV. CONCLUSION

Thomas's attack on Fregiste's credibility on appeal cannot form the basis for a successful sufficiency challenge. Furthermore, Detective Allen's testimony was relevant and any error under the Confrontation Clause was harmless beyond a reasonable doubt. In addition, Thomas failed to show that the Superior Court erred in permitting the jury to view the scene of the crime after the People closed their case. Finally, the

Superior Court did not abuse its discretion when it admitted M.H.'s photograph into evidence, nor did that photograph unduly prejudice Thomas. However, we hold that the Superior Court committed plain error by failing to sentence Thomas in conformity with 14 V.I.C. § 104. Accordingly, we affirm Thomas's convictions, but remand for resentencing.